### ANONYMOUS.

(Supreme Court, Special Term, Kings County. March 30, 1916.)

1. MARRIAGE &#9092;58(2)—ANNULMENT—GROUNDS—PHYSICAL INCAPACITY—"IN-CURABLE."

Under Code Civ. Proc. § 1743, authorizing annulment of a marriage for physical incapacity of one of the parties at the time of the marriage, but only where the incapacity continues and is incurable, if a slight operation will remove the incapacity without endangering life and health, the fact that one refuses to submit to such an operation does not justify annulment; but if the incapacity can be cured only by a dangerous operation, it is "incurable" within the law.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 116; Dec. Dig. &#9092;58(2).

For other definitions, see Words and Phrases, First Series, Incurable.]

2. MARRIAGE &#9092;60(7)—ANNULMENT—EVIDENCE.

In an action to annul a marriage on the ground of physical incapacity of the wife, evidence *held* insufficient to show that her difficulty has not been cured, or partially cured, and that the husband has not been able to consummate the marriage.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 131; Dec. Dig. &#9092;60(7).]

Action to annul a marriage. Judgment for annulment denied.

C. Walter Randall, of New York City (Alton B. Parker, of New York City, of counsel), for plaintiff.

Phœnix Ingraham, of New York City (Clifton P. Williamson, of New York City, of counsel), for defendant.

CRANE, J. [1] Due, no doubt, to the fact that so few cases brought to annul a marriage upon the ground of impotency have been contested, the law upon this subject in this state seems to be somewhat in doubt. What few authorities there are, together with the provisions of the Code of Civil Procedure, § 1743, lead to the conclusion that the law is as follows:

The physical incapacity of entering into the marriage state must exist at the time of the marriage and be incurable. That if a slight operation will remove the incapacity without endangering life and health, the fact that the incapable one refuses to submit to such an operation does not justify an annulment; whereas, if the incapacity can be cured only by a dangerous operation, such defect is incurable within the meaning of the law.

The Revised Statutes of 1828 (2 R. S. 144, pt. 2, c. 8, art. 3, tit. 1), headed, "Divorces on Ground of the Nullity of the Marriage Contract," provided that the chancellor may, by a sentence of nullity, declare void the marriage contract upon the ground, among others, that one of the parties was physically incapable of entering into the marriage state. The incapacity must have existed at the time of the marriage, but nothing in the statute was said as to curability.

Under this provision of the Revised Statutes was decided by Chancellor Walworth, the case of Devanbagh v. Devanbagh, 6 Paige, 175.

Referring to the incapacity which existed in the wife, the chancellor said:

"But from the testimony in this case I think there is good reason for believing that this disability is capable of being wholly removed by a slight surgical operation, and without the least possible danger to the defendant. And if there is a probability of capacity the court cannot annul the marriage. * * * The fact that the defendant has no wish to return to reside with her husband, and therefore will not consent to the slight surgical operation which may perhaps be necessary to remove the incapacity, is no ground for annulling the marriage, any more than if she refused to cohabit with him when no pretense of disability existed. That is a matter to be settled with her own conscience and her lawful husband, as this court has no jurisdiction in any case to enforce the performance of her marriage vows."

The law as thus stated by the chancellor has never been reversed or criticized, so far as I can find, by any subsequent decision in this state. On the contrary, this case has been cited continually as an authority in the various text-books and decisions. Anonymous, 21 Misc. Rep. 765, 49 N. Y. Supp. 331, reported with voluminous notes 28 Am. Dec. 449; Bascomb v. Bascomb, 25 N. H. 267; Anonymous, 89 Ala. 291, 7 South. 100, 7 L. R. A. 425, 18 Am. St. Rep. 116, cited in 26 Cyc. 902; 34 Am. Digest, § 116. Bishop on Marriage and Divorce (6th Ed.) at page 287, says of the doctrine that:

"The refusal to be cured by a slight operation is not ground for an annulment cannot be carried too far, "because no one can be required to run the hazard of life, or to submit to means of cure which in good faith he fears, however honestly and intelligently prescribed. Nor, in reason, is the doctrine to any extent, where remedies are declined, correct beyond question."

All the authorities cited by the author for his doubts upon this point are English cases, and no doubt the Ecclesiastical Law is broader than that stated in the Devanbagh Case. Such cases are L. v. L. (falsely called W.) 7 L. R. Prob. Divn. 16; G. v. G., 2 L. R. Prob. & Divorce, 287; S. v. A., 3 L. R. Prob. & Divorce, 72. How far the triennial test, the rule of the canon law, may have affected these cases, we cannot say. The fact is that in all of them the wife was shown to be a virgin after years of cohabitation. The triennial test of the canon law was not adopted in this country. Anonymous, 89 Ala. 291, 7 South. 100, 7 L. R. A. 425, 18 Am. St. Rep. 116; Merrill v. Merrill, 126 Mass. 228; Bascomb v. Bascomb, 25 N. H. 267. W. v. H. (falsely called W.) 2 Swab. & Tr. 240, frequently referred to, was based upon facts which showed that the operation would greatly endanger the life of the wife. H. v. P. (falsely called H.) 3 L. R. Prob. & Divorce, 126, was a judgment taken by default, the wife making no appearances and offering no denials. In the following cases we find it distinctly stated that the incapacity must be incurable; D. v. A., 1 Robertson's Rep. 279; Brown v. Brown, 1 Haggard's Ec. Rep. 524. In this case it was stated that treatment ten months after marriage offered some relief and the cure was in progress when the attendant ceased to treat her. A surgeon of Cambridge and two experienced women were of the opinion that the obstruction had been removed. See, also, J. G. v. H. G., 33 Md. 401, 3 Am. Rep. 183; Anonymous, 35 Ala. 226. In the latter case annulment was refused

where three doctors testified that the impotency was incurable and two testified that it had been cured. See, also, Payne v. Payne, 46 Minn. 467, 49 N. W. 230, 24 Am. St. Rep. 240.

Nothing in these authorities leads to the point where we can say that the law as laid down by Chancellor Walworth in the Devanbagh Case for this state in 1836 is not the law to-day. The Revised Statutes above referred to, and in accordance with which the decision was made, remained the same up to 1880. In that year section 1743 of the Code of Civil Procedure was enacted in the same words as it is at the present time. It reads as follows:

"An action may also be maintained to procure a judgment declaring a marriage contract void and, annulling the marriage for either of the following causes existing at the time of the marriage: * * * (5) That one of the parties was physically incapable of entering into the marriage state. But an action can be maintained under this subdivision only where the incapacity continues and is incurable."

The change made in 1880 by the Code provision just quoted is found in the words, "where the incapacity continues and is incurable." The word "incurable" having been given a meaning by Chancellor Walworth as above stated which was the law at the time of the Code enactment, it is fair to presume that the meaning intended by the word when inserted in subdivision 5 was the same as that existing in the law under the Revised Statutes, viz., that an incapacity which a slight operation could remove without danger to life or health was not incurable merely because of the refusal to submit to treatment. It is to be classed with that attitude of mind and disposition which refuses cohabitation, although potent; a situation which the man must bear with fortitude and self-denial according to our law.

If this be the correct statement of the law, the husband in this case is not entitled to relief, for it is conceded that whatever trouble his wife has suffered or is suffering from can be readily cured by treatment or stretching without danger, and that, if success has not already attended the doctor's efforts, it is due to the neglect or willfulness of the wife.

[2] However, the evidence in this case sufficiently shows that whatever impediment existed in the wife has been so far removed that the husband has been able, at times at least, to consummate the marriage, even if he has not been able to fully indulge his passions. An analysis of the evidence shows the following:

The plaintiff husband, who seeks to annul the marriage, is 63 years of age; the wife is 33. It is the second marriage of both of them. By his first marriage the husband had three children whose respective ages are, or would be, 35, 27, and 24. The defendant was for 13 years married to an officer in the United States navy who died in 1913, never having had children. None of the medical experts who have examined the wife have ventured an opinion that she had never had sexual relations with a man; in fact, the evidence showed that she was not a virgin. The husband in this case asserts that since the 6th day of January, 1914, the date of his marriage, he has not been able to consummate it, through no fault of his own; whereas, the

wife asserts that it was consummated "many, many times." She also admits that there has been difficulty at times in sexual intercourse, but says that it was due to the husband's excessive demands. So far as the testimony of the parties is concerned, it amounts to an affirmation upon the part of one and a denial upon the part of the other. To support the husband, Dr. Vedder testifies that in March of 1906, while the first husband was still living, he examined the woman at her request and found her suffering from vaginismus, which is a spasm of the muscles of the vagina making an insuperable barrier to intercourse. He advised an operation to which she did not submit. After her second marriage, he saw her again in 1914, and advised an operation or treatment for the nerves, stating to her:

"I told her that in some cases it was a good deal under her own control, not all cases, but I thought that a certain amount of this spasm could be controlled."

Dr. Wiley, an eminent specialist, in November of 1914, by arrangement of all parties, performed a stretching operation upon the defendant at the Ritz-Carlton Hotel in New York, where she was for a period of about three weeks. At that time he found her suffering from vaginismus to such an extent that it was difficult to introduce his fingers into the opening of the vagina. The stretching process he performed he called a minor operation and felt sure he could relieve her without the use of scissors or knife. He says that the treatment he then gave was probably insufficient to effect a permanent cure. She refused to have any further treatment. As to the possibility of having intercourse at that time with her husband, he says:

"Barely possible, but practically impossible if she did not give her full consent; but I might say in my opinion that at the exact time of my first physical examination of her it was impossible.

"Q. In your opinion, had she been physically able to fully consummate the marital relation with her husband at any time between January 5, 1914, and the date of your examination of her? A. Practically impossible to answer this question intelligently, for her condition may have varied at different times of the month, and she may have given herself some slight treatment, like douches, or something else, to temporarily relieve this supersensitive condition; but the diameter of the vagina was so small at one place that sexual relations would have been most difficult.

"Q. In your opinion, would the defendant be physically able to consummate the marriage relation after the date of the operation performed upon her by you without submitting to any further course of treatment? A. Yes, probably for a short period."

Again he says:

"The operation itself was merely a partial and temporary success in my opinion, and with further treatment I could have made it a complete and permanent success."

As against this testimony in behalf of the husband, we have the evidence given in behalf of the wife, which is as follows:

Dr. James Wright Markoe, an eminent gynecologist and obstetrician of New York City, examined the woman in October of 1915, nearly a year after Dr. Wylie's minor operation, and testifies that he found no true vaginismus present, and her physical condition was

such that she was by no means incapable of the marital relation. "There was no tonic spasm of that muscle which would prevent intercourse." He told the husband that he could see no reason why he could not have intercourse with his wife.

Dr. John O. Polak, also one of the leading gynecologists in New York City, selected by the court to make an examination of the defendant, testified that she had no vaginismus, that he could easily insert his fingers into the vagina, that she was not abnormal, and "physically this woman had a patent vagina and an opening sufficient to admit an ordinary male organ with her co-operation."

Admissions made by the husband contrary to his testimony, and to the effect that he had consummated the marital relations, was also testified to by disinterested parties. These admissions cannot be lightly brushed aside, for it is difficult to understand why the persons testifying should be so interested or biased as to deliberately and willfully misstate. Thus Dr. Wylie says: "I was told by the husband that everything was satisfactory a short while after the operation." Francis L. Wellman, a lawyer consulted by the parties, or one of them, testifies that the husband, after Dr. Wylie's operation, came to his office "and seemed to be very happy. I asked him if everything had gone all right after the operation, and he said: 'Yes, everything is all right; but I am afraid we won't get on as man and wife all the same. Afraid it won't last.' "

A brother of the husband—the two having adjoining country places—testifies that the plaintiff said of his marriage that he was very happy, and after the operation "said that he was perfectly contented, and everything was going all right, and that everything was as it should be. He said that he was happy, that his marriage had been consummated, and that he was perfectly contented."

Upon this brief and summary statement of the evidence as it is lined up for and against, it seems quite apparent that the husband has failed to prove that his wife's difficulty has not been cured, or partially cured, and that he has not been able to consummate the marriage. The conclusion must be that he has.

It is just to him to say that this litigation was not of his instigation. He lived with his wife from January, 1914, to October, 1915, when she left him and, so far as the evidence shows, would have continued to support her·in his own home without making public the difficulties of their existence. He has very manfully said:

"I believe that if I had that little woman by myself we would get along, but whoever she has been consulting with is giving her the worst advice and can only lead to her own unhappiness and mine."

He did not leave her because of any unfortunate and unexpected revelations, and says that the reason he supposes that she left him "was because we could not agree what to do this winter."

No doubt the plaintiff has been unable to satisfy those passions and instincts which still remain vigorous at his time of life, and the frail and delicate appearance of the defendant, as contrasted with his robust and virile physique, would indicate that difficulties might arise

between the two over sexual matters. It certainly cannot be considered cruelty upon his part, justifying her departure from his home and life elsewhere at his expense, that he pressed his desires and demands upon her with some roughness and force and to an extent which made her nervous, uncomfortable, or even ill. If the man under our law must submit to the refusal of the wife to have intercourse, the wife certainly must submit to vigorous efforts in this direction. Violence from temper is an entirely different thing from violence through natural instincts.

In denying the husband the relief asked, I do not expect to restore happiness to his home, or to remove the difficulties which I know to exist. This court is limited in action to cases brought within the statute, and, for the reasons which I have above expressed, the husband has failed to establish any incurable disability upon the part of his wife. Here the law stops, leaving the parties to such other adjustments of their affairs as conscience and disposition permit

Judgment for annulment denied.